IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 21, 2013

**TROY DOUGLAS BARTLEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Sullivan County**
**No. C59887      Robert H. Montgomery, Jr., Judge**

_____

**No. E2012-01881-CCA-R3-PC - Filed September 27, 2013**

_____

The Petitioner, Troy Douglas Bartley, appeals the Sullivan County Criminal Court's denial
of post-conviction relief from his convictions of two counts of aggravated assault, Class C
felonies, one count of delivery of cocaine within 1,000 feet of a school zone, a Class B
felony, one count of possession of cocaine with intent to sell or deliver within 1,000 feet of
a school zone, a Class A felony, one count of attempted first degree murder, a Class A
felony, one count of retaliation for past action, a Class E felony, and two additional counts
of aggravated assault, Class C felonies. Based on the guilty plea hearing transcript, the
Petitioner pleaded guilty in case number S57,639, to two counts of aggravated assault, both
of which were merged by the trial court, and received a three-year-sentence. In case number
S58,333, the Petitioner pleaded guilty to delivery of cocaine within 1,000 feet of a school
zone, count one, which merged with count two, possession of less than five-tenths of cocaine
with intent to sell or deliver within 1,000 feet of a school zone, and received an eight-year
sentence. In case number S58,374, the Petitioner pleaded guilty to attempted first degree
murder, count one, retaliation for past action, count two, and two additional counts of
aggravated assault, counts three and four, which the trial court merged with count two. In
regard to case number S58,374, the Petitioner was sentenced to fifteen and four years,
respectively. The trial court ordered "all counts in each case [to be served] concurrent[ly]
but each of the cases [were] consecutive[,]"for an effective sentence of twenty-six years'
imprisonment. On appeal, the Petitioner argues that he received ineffective assistance of
counsel and that he entered involuntary and unknowing guilty pleas.[1] Upon review, we
affirm the judgment of the post-conviction court.

---

[1] In his petition for post-conviction relief, the Petitioner also argues that the State withheld
exculpatory evidence. The post-conviction court denied relief on this issue, and the Petitioner did not raise
it in his brief. Consequently, we do not address it on appeal because it is waived.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

L. Dudley Senter, III, Bristol, Tennessee, for the Petitioner-Appellant, Troy Douglas Bartley.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Barry Staubus, District Attorney General; and Lesley A. Foglia and Daniel Hall, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**Guilty Plea Hearing**.  On January 5, 2011, the Petitioner entered a guilty plea to the above offenses and, pursuant to the terms of his plea agreement, received an effective twenty-six-year sentence.  Prior to accepting the Petitioner's guilty plea, the trial court read a "Request for Acceptance of Plea of Guilty" and "Waiver of Rights" forms to the Petitioner. The trial court advised the Petitioner that the "plea form" contained rights, which were described in detail by the court, that the Petitioner was waiving by entering a guilty plea and that his signature on the form certified that he was not under the influence of any drugs and fully understood the nature of his actions.  The Petitioner affirmed that he signed the forms and understood them.  The trial court explained the penalty for each offense as outlined in the plea agreement, the elements of each offense, and the respective sentencing range, which the Petitioner also affirmed that he understood.  Finally, the trial court asked the Petitioner whether he had been forced, threatened, intimidated, or pressured to enter a guilty plea, and the Petitioner replied, "No, Sir."

In regard to the aggravated assault case, the Petitioner agreed that he was pleading guilty "in the form of a 'best interest' or Alford plea," after having fully discussed his case with defense counsel.[2]  The proof supporting the Petitioner's guilty plea for the aggravated assault was summarized by the State as follows:

> [O]n January 15th, 2010[,] around 5 o'clock in the morning[,] officers
> responded to 1933 Tri-Cities Crossing in Kingsport, Sullivan County.  They
> had been called because [the Petitioner] had hit the victim, Kathy Smith, over

---

[2] Based on North Carolina v. Alford, 400 U.S. 25, 37  (1970), a defendant may enter a plea of guilty while at the same time maintaining his innocence if he determines that it is in his best interest to do so. A trial court may accept a defendant's "best interest" or Alford plea so long as there is a factual basis for the plea. See Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (internal citations omitted).

the head with a blunt object that she believed to be a beer bottle. The officers responded and observed the victim lying in the kitchen bleeding from the back of her head. She had stated that she and [the Petitioner] had gotten into an argument. . . . [T]hey were in a romantic relationship at the time. He got angry and hit her in the head with some type of object. . . . This was witnessed by witnesses. . . . The victim was taken to the hospital. . . . She had a large laceration to her head that required stitches and the hospital confirmed that it was blunt force trauma to the head.

The factual basis supporting the Petitioner's guilty plea to the above drug related offenses was as follows:

[T]he Kingsport Vice Unit had set up a controlled buy against, and this is actually different than a normal controlled buy would normally be, against [the Petitioner], but also against an individual by the name of Freddie Hernandez. . . . [I]n the nighttime hours of July 6, 2010[,] Kingsport Vice officers Cliff Ferguson, Steve Summey, Tim Crawford and Nathan Elliott met with the confidential informant Lloyd Allen McDavid in reference to purchasing cocaine. McDavid had already been - - - - had done several controlled buys for the Kingsport Vice Unit and having talked with [the Petitioner] to make an attempted purchase of cocaine from him. Prior to the controlled buy the confidential informant had spoken with [the Petitioner] about purchasing an 8-ball and [the Petitioner] had quoted him a price of $250.00. They had been driving in a vehicle and . . . [the Petitioner] pointed out where he would be obtaining that cocaine. The confidential informant had been told by Kingsport Vice that he was not to give [the Petitioner] his money but to try to go with him, which he did, and they met at [the Petitioner's] home on July 6, 2010[,] at Garden Apartments. He and [the Petitioner] walked to the residence of Freddie Hernandez. [The Petitioner] instructed the confidential informant to remain outside and walk on the sidewalk while he went around back to make the purchase. . . . [T]he confidential informant gave [the Petitioner] $250.00 in buy money that had been previously photocopied by the vice unit and the vice unit had followed him as well. Nathan Elliott was on one side of the building and Tim Crawford and Steve Summey and Cliff Ferguson were on the other to observe. Nathan Elliott observed an exchange between [the Petitioner] and Freddie Hernandez. They parted ways. At that time [the Petitioner] went to one side of the building and the Hispanic, Freddie Hernandez, went to the other where he was confronted by law enforcement, and not that this would come into evidence at [the Petitioner]'s trial, but Mr. Hernandez did admit to selling cocaine to [the Petitioner]. [The Petitioner]

goes to the other side of the building where Steve Summey witnesses him throw a bag of white substance onto the ground and he is apprehended. Some of the buy money was found on Freddie Hernandez and then when [the Petitioner] was booked into the jail a $20.00 bill of the buy money was still on [the Petitioner]'s person. The white bag of substance was sent to the TBI for analysis and it came back as cocaine, a Schedule II drug in the amount of 2.4 grams, that occurring in Sullivan County and it was within 1,000 feet of Lincoln Elementary School.

The court asked the Petitioner in reference to this case: "Are you pleading guilty to those charges because you are guilty?," and the Petitioner answered, "That's correct."

The State summarized the proof supporting the Petitioner's guilty plea for attempted first-degree murder as follows:

[The drug case] is linked to this case in that [the Petitioner] was given a $100,000 bond that night. . . . [The Petitioner] made that bond and . . . knew who the confidential informant [in the above drug case] was by the name of Allen McDavid. [The Petitioner] got with two of his friends, Andy Goldbach and David Laginess and began looking for the victim later that night. That would be the night of July 7th, the next day. [The Petitioner] and the confidential informant, Mr. McDavid, lived in the same apartment complex. He was calling him a snitch, that he was going to beat him up. The victim was afraid to go home because [the Petitioner], Goldbach and Laginess were lurking around the apartments so he parks near his home and goes to a laundry mat and calls 911. You can hear on the 911 tape he's calling - - - - he's got a hammer on his person because he knows they're trying to - - - - he had heard, other neighbors had told him that they were going to try to come kill him so he had a hammer on his person. He calls 911 and you hear [the Petitioner] and the two co-defendants approach saying they're going to kill him, "I'm going to finish him off." These things are on the tape. One of the defendants sees him at the laundry mat and that's why they approach him. They approach him . . . with a knife and they're kicking him and one of the defendants, Laginess[,] goes back to his apartment, . . . [the Petitioner]'s apartment and obtains the axe handle and comes back where they continue to beat him. They're stating, "I'm going to kill you." At one point[,] [the Petitioner] takes the axe handle and makes the statement, "I'll finish him off," and hits him several times up to the point that the police arrive and all the defendants take off running. A witness, Donna Trask (phonetic), who is a neighbor, will state prior to the assault that [the Petitioner] showed up at her house with an axe handle saying that the

-4-

victim was going to be leaving in a coroner's van. Another witness, Timothy McMurray, heard [the Petitioner] say he was going to "F him up." The victim was taken to the hospital. He was discharged the same day. His injuries were a left ulnar fracture. He lost consciousness, a laceration on his right cheek that required stitches, a left forearm laceration, multiple abrasions, a fracture to the right wall of his sinus, a depressed fracture to the right arch of his sinus and a non-displaced fracture on the right orbital floor in his eye socket.

The Petitioner acknowledged that he heard the State's evidence in the aforementioned cases and agreed that it was "most definitely" true. When the trial court asked the Petitioner if he was "satisfied with the representation that [he] received from [counsel] in this case?" the Petitioner responded, "Yes, sir." Finally, when the trial court asked, "[Was there] [a]nything you've asked [counsel] to do he's not done?" the Petitioner responded, "He's been top-notch." The trial court then accepted the Petitioner's guilty plea and sentenced him in accordance with the plea agreement.

On September 16, 2011, the Petitioner filed a timely pro-se petition for post-conviction relief, alleging that he had received ineffective assistance of counsel and that his guilty pleas were involuntary and unknowing. The Petitioner was subsequently appointed counsel, who filed an amended petition on the Petitioner's behalf alleging that (1) the Petitioner's guilty pleas were unlawfully induced and entered into without an understanding of the consequences and was involuntary; (2) the prosecution withheld information regarding certain witnesses that could have been used for impeachment; and (3) trial counsel performed below the minimum ascertainable standards by failing to develop proper strategies and defenses. The post-conviction court conducted an evidentiary hearing on July 25, 2012.

**Post-Conviction Hearing**. Counsel, a practicing lawyer for over fifteen years, testified at the post-conviction hearing regarding all three cases and his meetings with the Petitioner throughout the proceedings. Counsel had two initial concerns regarding the drug case. Based on the testimony provided at the preliminary hearing, there was a discrepancy between "the amount of money that apparently had been given to the CI" and the amount of money that was recovered from the Petitioner and his co-defendant. There was also a possibility that the officers failed to maintain visual contact with the Petitioner and his co-defendant during the transaction. Counsel further testified that after the preliminary hearing, he met with the Petitioner and discussed the facts as well as developed a strategy of the case. He stated:

We had to [confirm] whether or not this alleged transaction actually occurred within the 1,000 feet of the school zone. We had to determine what video or audio evidence the police department may have had and again review

the affidavits of complaint, review the testimony from the preliminary hearing and then basically discuss that with [the Petitioner] and try to develop some sort of strategy going forward as to whether or not there was enough evidence to find guilt beyond a reasonable doubt.

Counsel explained that he later obtained a copy of the school zone map, researched the transcripts and affidavits of complaint, and interviewed two of the arresting officers. He confirmed that at least one officer maintained visual contact with the Petitioner during the transaction.

In regard to the attempted first-degree murder case, Counsel stated that his defense strategy would have been "self defense, of course." Counsel testified that he filed a motion for discovery, researched the file in the clerk's office, and "prepared a summary of the charges and the code sections that applied [to the offense] for [the Petitioner]."

Counsel stated that he met with the Petitioner on September 20, October 21, and October 29 to review the evidence and discuss the cases. He received a plea offer from the State on October 28, and an amended plea offer on December 2, 2010. He met with the Petitioner after receiving each plea offer, but the Petitioner was unable to make a decision at the meetings. After the trial court denied Counsel's request to set the aggravated assault case for trial first, the trial court set the drug case for trial on January 5, 2011. Counsel testified that at that point in the preparation, he had reviewed all of the discovery with the Petitioner, including the 9-1-1 phone call and photographs of the scene, and discussed the plea offers with the Petitioner. He stated that "[w]e knew what the State was going to present. We had an amended [plea] offer. It was left for [the Petitioner] to mull that over."

Counsel met with the Petitioner again on December 15, and they "continued to review the evidence, to talk about the options going forward, [and] talk about his chances of success." The Petitioner remained undecided regarding the State's settlement offer. Counsel testified that, in the meantime, he continued to prepare for trial, focusing on the drug trial, which was scheduled first. He acknowledged that he did not file any motions, explaining "[the Petitioner] and I talked about this . . . we were not going to file any motions [in the drug case]." He stated that the District Attorney informed him that there was a third officer that the State planned to call as a witness who was prepared to testify that he witnessed the Petitioner drop the bag of cocaine. He conceded that he had not interviewed this officer. Counsel further testified that he considered joining the Petitioner's case with the co-defendant's, Mr. Hernandez's, but decided it was not in the Petitioner's best interest.

Counsel testified that he met with the Petitioner again on January 3, 2011, to determine whether the Petitioner had decided to accept the settlement offer, but the Petitioner

said he needed more time. Counsel stated that he spent the next day preparing for trial. The day before trial, Counsel was advised by the court that the Petitioner had until 5:00 p.m. that day to accept the State's settlement offer or proceed to trial. Counsel testified that he then called the Petitioner to advise him of the deadline, and that "[a]fter a couple of minutes of discussion [the Petitioner] said he was going to accept the plea." The next morning he met with the Petitioner and went over the plea form with him.

Counsel stated that he had not yet interviewed anyone on the murder case or the assault case because these witnesses were not due to be heard until months later in April. He acknowledged that the Petitioner had suggested questioning Kathy Smith as a potential witness but stated that he had been informed that Ms. Smith was not going to be available as a witness. Counsel conceded that he had never conducted a jury trial before but insisted that he did not need more time to prepare for the trial. He noted that he had discovery for several months, received two plea offers, met with the Petitioner numerous times, and knew when the trial was set. He stated, "There was plenty of time to prepare and plenty of time to ponder this [plea] offer and make a reasonable decision."

On cross-examination, Counsel clarified that he had previous trial experience in civil bench trials and had conducted preliminary hearings in general sessions court and detention hearings in federal court. Counsel reiterated that he reviewed the State's evidence for all three cases with the Petitioner, including the preliminary hearing transcripts, the TBI analysis of the cocaine, photographs of the marked money, photographs of the victims in both the attempted murder and the assault cases, the 9-1-1 phone call, and statements made to the police. He testified that he provided a copy of all of the discovery to the Petitioner and stated "I believe the State had sufficient evidence in this case but with all clients I let them make the decision whether they believe the State has sufficient evidence against them."

Officer Cliff Ferguson testified that he was one of the four officers involved in the drug investigation. He stated that he did not witness the drug transaction but that two of the other officers had a direct view of the transaction. After these officers notified him that the transaction was complete, he waited for the Petitioner to come to the front of the building, where Officer Ferguson arrested the Petitioner. Officer Ferguson stated that he then frisked the Petitioner, checked for warrants in his name, and discovered an outstanding warrant for the Petitioner. He stated that he placed the Petitioner in his police car and returned to the spot where he initially encountered the Petitioner. He found a bag of cocaine lying on the ground.

When questioned about his ability to identify the drug, Officer Ferguson responded, "Well, it hadn't been tested but [by] the look and the texture and the smell of it, I felt certain it was cocaine." Officer Ferguson conceded that the bag of cocaine was left lying on the

ground for "somewhere around the five minute mark." He also agreed that the location where the offense took place was a high-crime neighborhood but opined that it was "highly unlikely" that the bag of cocaine belonged to someone other than the Petitioner. He stated the distance between his police car and where he eventually found the cocaine was fifty feet.

On cross-examination, Officer Ferguson testified that he did not see anyone else in the area before or after he apprehended the Petitioner and that he did not see anything on the ground. On redirect examination, Officer Ferguson conceded that he had not conducted an official sweep of the area prior to the Petitioner's arrest. When asked if it was possible that the cocaine was present prior to the Petitioner's arrest, Officer Ferguson responded, "It's not probable, but anything is possible."

Kathy Smith, the victim in the Petitioner's assault case, testified that she approached defense counsel and offered herself as a witness on the attempted murder charge. She said that, prior to the offense, she saw the Petitioner unarmed and the victim, Mr. McDavid, with a hammer. She stated that she did not witness the fight but was with the Petitioner right before the fight. She testified that when Mr. McDavid arrived to return the van he had borrowed to its owner, the Petitioner ran "out of the room and he jerks his shirt off and goes running towards the Laundromat [where Mr. McDavid was located]." She drove the owner of the van to the Laundromat to pick up his van, and when they arrived, she saw the Petitioner standing in front of Mr. McDavid. She testified that "[the Petitioner] had no weapon. Mr. McDavid had a hammer." She explained that she left the scene at that time because she "didn't know what was going to happen[.]" When she returned to the Petitioner's apartment, she observed Mr. Lajeniss run into the apartment, retrieve a pickaxe handle out of the Petitioner's room, and return to the Laundromat parking lot. She testified that she repeatedly called defense counsel but never heard back from him.

On cross-examination, Ms. Smith testified that, as far as she knew, the Petitioner did not have a knife in his pocket but conceded that she had not checked his pockets. She also conceded that she did not go to the police with her story to try to clear the Petitioner's name. The court questioned Ms. Smith about an order prohibiting the Petitioner from contacting her as a result of the assault charge; however, Ms. Smith was unaware of the order.

The Petitioner testified and explained that after he pleaded, he "had time to sit back and look and grasp" the guilty pleas in this matter. He said that while in prison, he realized that he "had a lot of options I could have taken other than just down here accepting [a guilty plea]." He testified, consistently with the testimony of Counsel, that he met with Counsel several times and acknowledged reviewing the State's evidence with Counsel. However, the Petitioner said that they never discussed trial tactics or potential witnesses. He suggested that Ms. Smith "might have been a decent witness in the aggravated assault case because as

far as [he] knew, she wasn't going to be pressing the issue." The Petitioner stated that at their meeting on December 15, he and Counsel discussed his clothing for the trial and that the jury that had been selected. He also testified that Counsel told him he "would never see daylight again" if he was found guilty at trial.

The Petitioner believed that he was coerced into entering a guilty plea because Counsel called him on the eve of trial and advised him that the court needed to know whether he was going to enter a guilty plea by 5:00 p.m. that day. The Petitioner explained, "[I] already had it in my mind I was going to be going to trial the next day. . . . When the guards told me that there was a phone call from my lawyer I was expecting it to be about my clothes and stuff like that." The Petitioner said that the police officers at the jail were telling him to "hurry up" and "get off the phone" because the phone call from Counsel occurred at "feeding time." The Petitioner stated that Counsel was simultaneously telling him that the court needed to know how he intended to proceed. The Petitioner testified that he asked Counsel what he would do, and Counsel responded, "Well, I already told you what my opinion was, that if you take it to trial you're never going to see daylight again." The Petitioner testified that he accepted the settlement offer and told Counsel, "Blank it I'll take it."

The Petitioner stated that he reviewed the plea document with Counsel the next day, but at that point, he was confused and "scared to death." He signed the document even though he did not understand it, and even though he had questions, he was too scared to ask them. He testified that Counsel advised him to "[j]ust go in there and just say yes to everything they say." He told the judge that he understood his rights and accepted the terms of the plea agreement as instructed by Counsel. He stated that if he could testify again he, "wouldn't have said yes to all those things [he] did on the transcripts. [He] would - - - - for one [definitely] take it to trial and [definitely] be more better - - - - find a way to be better prepared."

When asked about his testimony regarding Counsel being "top-notch," the Petitioner explained that, at the time, he "didn't know any better." He stated that after doing some research at the prison law library, he realized there were many defenses that he could have raised and that he would "like to have [his] day in court on all this."

On cross-examination, the Petitioner agreed that he had been offered two separate settlement agreements, and the second offer, which he accepted, had a "greatly reduced" sentence from the first. He also agreed that he was notified of the second offer in December and did not accept it until January 4. He acknowledged that he was under oath when he testified at his guilty plea hearing and agreed that he perjured himself when he told the court that he wanted to plead guilty and that no one had pressured him into making the plea. He explained that he was following his attorney's advice to answer all questions in the

affirmative. He conceded that the statement regarding Counsel's being "top-notch" was not at Counsel's request but was his own doing. The Petitioner also conceded that had he raised a self-defense theory at trial, it was likely that he would have had to testify, which would have opened the door for the jury to hear about his prior felony convictions.

On redirect examination, the Petitioner clarified that, at the time of his guilty plea, no one had informed him of the consequences of his testifying. He also clarified that he did not believe he was lying to the judge at his guilty plea hearing but thought that he "was doing the right thing at the time." He explained that his answers to those questions changed after he got to prison and researched the matter on his own.

The court questioned the Petitioner regarding a guilty plea he entered in 1988 in Alabama, and the Petitioner initially denied any recollection of the proceeding. The Petitioner eventually acknowledged the guilty plea, and the court pointed out that the present case was not the first time the Petitioner had been to court and entered a plea. The Petitioner also agreed that after hearing the State present the facts supporting its case, he did not answer "yes," as he claimed his attorney instructed him to do, but he stated that the facts were "[m]ost definitely" true.

In rebuttal, Counsel testified that, to his knowledge, Ms. Smith never contacted his office to schedule an appointment. On cross-examination, Counsel admitted that it was possible, but not likely that his office misplaced a message from Ms. Smith.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. On August 8, 2012, the court entered a detailed order denying post-conviction relief and concluded, among other things, that the Petitioner "failed to show by clear and convincing evidence that [Counsel] was in any way ineffective or deficient in his performance as counsel representing Petitioner." The court also determined that the Petitioner entered a knowing and voluntary guilty plea, that the Petitioner understood the nature and consequences of his plea, and that the Petitioner was not forced or coerced into entering his plea by his attorney or by his attorney's performance as defense counsel.

It is from this order that the Petitioner now appeals.

## ANALYSIS

The Petitioner contends that trial counsel provided ineffective assistance of counsel by failing to properly investigate the Petitioner's case and by failing to file a motion to suppress evidence. He maintains that Counsel's performance fell below the standard of reasonableness for criminal attorneys and that he would not have pleaded guilty but for Counsel's errors. The

State responds that the post-conviction court properly denied the petition for post-conviction relief because Counsel was not deficient in his performance, and the Petitioner entered his guilty pleas knowingly, intelligently, and voluntarily. Upon review, we agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

In Vaughn, the Tennessee Supreme Court repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984);

Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). Within the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also, Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**I. Ineffective Assistance of Counsel.** In alleging that Counsel failed to investigate his cases prior to trial or entry of his guilty plea, the Petitioner specifically argues that Counsel did not discuss trial tactics or defense strategies with him and failed to interview important witnesses such as the officers involved in the drug case or any witnesses in the attempted murder case. The Petitioner is particularly critical of Counsel's failure to contact Kathy Smith, the victim in the assault case and a potential witness in the attempted murder case, because he asserts that she could have provided testimony to support a self-defense theory in the attempted murder case.

The Tennessee Supreme Court has held that "[f]ailure to conduct a reasonable investigation constitutes deficient performance." Burns, at 6 S.W.3d at 462.

-12-

[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. (citing Strickland, 466 U.S. at 691). This Court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witness should be presented at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id. Furthermore, "the Petitioner is not entitled to relief from his conviction on this ground unless he can produce a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." Id. at 758.

In denying relief on this issue, the post-conviction court found that Counsel "provided the Petitioner exceptional representation in the cases in question." The court concluded that Counsel was "actively involved" in the Petitioner's defense throughout his representation and noted that Counsel conducted an extensive preliminary hearing, provided the Petitioner with copies of all discovery, reviewed the State's evidence with the Petitioner, and negotiated a significant reduction in the plea offer from the State. The court also noted that the Petitioner testified at the guilty plea hearing that Counsel was "top-notch," which contradicted the Petitioner's testimony at the post-conviction hearing that Counsel instructed the Petitioner to answer "yes" to all questions asked. The post-conviction court credited Counsel's testimony that he was prepared for trial and determined that the Petitioner decided to accept the plea offer on the eve of trial to avoid the risk of conviction by a jury. Based on the record and testimony presented, the court concluded that the Petitioner failed to prove by clear and convincing evidence that Counsel provided ineffective assistance of counsel.

The record does not preponderate against the post-conviction court's findings. The record, specifically the testimony at the post-conviction hearing and log sheets of Counsel, confirms that Counsel conducted extensive discovery, reviewed the evidence with the Petitioner, and negotiated two settlement offers with the State. Although the Petitioner asserts that Counsel failed to interview the arresting officers in the drug case, the record establishes that Counsel interviewed two of the officers and reviewed their preliminary hearing testimony and affidavits. Moreover, with regard to the officers that Counsel did not interview, the Petitioner did not present these officers at the post-conviction hearing. Thus, because neither the post-conviction court nor this Court can speculate as to their testimony

or how they could have aided the Petitioner's defense, see Black, 794 S.W.2d at 757, the Petitioner is not entitled to relief.

In regard to Counsel's failure to interview Kathy Smith, we agree that her testimony may have been relevant to the defense in developing its theory of the case. Here, the post-conviction court noted that prior to the fight, Ms. Smith observed the victim holding a hammer and the Petitioner was unarmed. However, the court also noted that Ms. Smith did not observe the fight that resulted in the attempted murder charges against the Petitioner. Counsel explained that he was informed that Ms. Smith would not be testifying against the Petitioner in the assault case. Counsel further stated that he did not contact Ms. Smith about the attempted murder case at that point because "that trial had not been set. . . . [and Ms. Smith] had apparently not either appeared or was not available for the last trial that was set in [the Petitioner's] case." Counsel was concerned due to the delicate nature of Ms. Smith's relationship to the cases, as a victim in one case and possible witness in another, and emphasized that his primary focus, at that point, was on the drug case. Given the above considerations, we are unable to conclude that Counsel's decision not to interview Ms. Smith was unreasonable. Therefore, the Petitioner has failed to demonstrate that Counsel's actions constituted deficient performance.

Moreover, even if Counsel's failure to interview Ms. Smith was deficient, the Petitioner has not proven that this deficiency resulted in prejudice to his defense. As the State correctly notes in its brief, Tennessee's self-defense law states that: "The threat or use of force against another is not justified . . . [i]f the person using the force provoked the other individual's use or attempted use of unlawful force, unless[] [t]he person using force abandons the encounter or clearly communicates to the other the intent to do so." T.C.A. § 39-11-611(e)(2)(A) (2012). Although Ms. Smith testified that the Petitioner did not take the alleged weapon, the pickaxe handle, to the fight, her testimony confirms that the Petitioner initiated and escalated the confrontation. She testified that when the Petitioner learned that the victim had arrived at the Laundromat, the Petitioner "jerk[ed] off his shirt" and ran to the Laundromat to confront the victim. Even if the Petitioner did not take the pickaxe handle to the fight initially, the weapon was retrieved during the fight apparently at the Petitioner's direction and used to severely injure the victim. Nothing in Ms. Smith's testimony suggests that the Petitioner attempted to abandon the encounter or communicate his intent to do so, as required to prove self-defense. Consequently, the Petitioner cannot establish the requisite prejudice prong of Strickland to prove that Counsel's failure to interview Ms. Smith resulted in prejudice to his case.

The Petitioner also broadly asserts that Counsel was ineffective for failing to interview "all the other witnesses discussed above," without specifically naming any such witnesses.

The Petitioner did not present any of these proposed witnesses at the post-conviction hearing, and thus, he is not entitled to relief on this issue. See Black, 794 S.W.2d at 757.

Next, the Petitioner contends that Counsel should have filed a motion to suppress the bag of cocaine under Tennessee Rules of Evidence 403. The Petitioner asserts that because the bag of cocaine was found in a high-crime area that was not secured by the police, it undermines the likelihood that the bag belonged to the Petitioner. As such, the Petitioner contends that arguable grounds exist to suppress the incriminating evidence under Rule 403, and Counsel's failure to move to suppress constitutes ineffective assistance of counsel.[3]

This Court has stated that "if arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence." State v. Donte Montgomery, No. W2006-00347-CCA-R3-PC, 2007 WL 595599 at *8 (Tenn. Crim. App. Feb. 26, 2007) (citing Robert C. Bellafant v. State, No. 01C01-9705-CC-00183, 1998 WL 242449, at *6 (Tenn. Crim. App. May 15, 1998)). However, in order to prevail on an ineffective assistance of counsel claim based on the failure to file a motion, the Petitioner must prove not only that the failure to file the motion constituted deficient performance, but also that he was prejudiced by that failure. Id. Prejudice within the context of a motion to suppress is established by showing that the evidence was inadmissible by clear and convincing evidence. Id. (citing T.C.A. § 40-30-110(f) (2003)).

The post-conviction court rejected the Petitioner's claims on this issue, reasoning that Counsel had interviewed officers who confirmed that at least one officer had visual contact with the Petitioner at all times and witnessed him drop a white bag. The court credited Counsel's testimony that he had interviewed the officers involved who confirmed that there was "continued observation of the Petitioner by the officers," which contradicted the Petitioner's claims that officers lost sight of the Petitioner after the drug transaction. As a result, the court concluded that there were no grounds upon which Counsel could have successfully argued a motion to suppress the evidence. The record does not preponderate against the post-conviction court's conclusions, and given the below analysis and conclusion, the Petitioner's reliance on Rule 403 does not persuade us otherwise.

As we understand the Petitioner's argument, he asserts that there is insufficient evidence to connect the bag of cocaine to the Petitioner, and as a result, reasonable grounds exist to exclude the evidence under Rule 403 as it would be highly prejudicial to the

_____

[3] In his petition for post-conviction relief, the Petitioner alleges that Counsel should have made various other motions, such as a motion to sever or a self-defense motion. The post-conviction court denied relief on these claims, and the Petitioner did not raise them in his brief. Therefore, these claims have been waived.

Petitioner's case. Under Tennessee Rules of Evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. However, this Court has held that "the mere fact that evidence is particularly damaging does not make it unfairly prejudicial." State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993); see also, State v. Dulsworth, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1998) ("Any evidence which tends to establish the guilt of an accused is highly prejudicial to the accused, but this does not mean that the evidence is inadmissible as a matter of law."). Rather, unfair prejudice has been defined by the Tennessee Supreme Court as "'[a]n undue tendency to suggest a decision on an improper basis, commonly, though not necessarily an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Committee Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)), perm. app. denied (Tenn. Nov. 2, 1998).

In the present case, the Petitioner has not established any grounds to exclude the evidence as unfairly prejudicial under Rule 403. The Petitioner does not assert that the purpose of introducing the bag of cocaine was to elicit a decision based on emotions of bias, sympathy, hatred, contempt, retribution, or horror; nor does he assert that the introduction of the bag of cocaine created a danger of confusing or misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. See Tenn. R. Evid. 403. Rather, he merely asserts that doubt exists as to whether the bag of cocaine could be connected to the Petitioner. We agree with the State that exclusion based on this premise is not the role of Rule 403. The gravamen of the Petitioner's claim is that the evidence was irrelevant. See Tenn. R. Evid. 402. Based upon the projected testimony, the trial court would have been within its discretion to hold that the evidence was relevant. Therefore, we conclude that the Petitioner has failed to prove by clear and convincing evidence that the bag of cocaine was inadmissible, and he is not entitled to relief on this issue.

**II. Guilty Plea.** The Petitioner contends that due to Counsel's deficiencies, he entered involuntary and unknowing guilty pleas. He maintains that he believed he was going to trial up until the night before the trial date when Counsel called him and coerced him into accepting the plea offer by telling him that "he would never see the light of day again" if he did not accept it. He contends that Counsel was not prepared for trial and that he accepted the plea offer because he was scared. He further asserts that he only answered affirmatively to all of the questions asked during the guilty plea hearing because Counsel advised him to say "yes" to everything asked.

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligently made. Id. These factors include the following:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

In denying the Petitioner relief on this issue, the post-conviction court concluded that the transcript of the plea reflects that the Petitioner was fully advised of his rights and waived his right to a trial in all three cases, without hesitation. The court rejected the Petitioner's allegations that he was simply following Counsel's advice to answer "yes" to all questions asked, noting that the Petitioner answered "most definitely" in response to the stipulation of facts in the drug and attempted murder case, and stated that Counsel was "top-notch" in his representation. The court credited Counsel's testimony that he was prepared for trial and had no preference whether the Petitioner accepted the plea deal, concluding that the Petitioner accepted the plea rather than risk the consequences of a trial by jury. Thus, the court

determined that the Petitioner had failed to prove by clear and convincing evidence that his guilty pleas were involuntary and unknowing.

Nothing in the record preponderates against the post-conviction court's findings. Although the Petitioner asserts that he was pressured into pleading guilty on the eve of trial, the record reflects that Counsel advised the Petitioner of the amended plea offer on December 2, 2010, over a month before he actually accepted the plea offer. Counsel testified that he reviewed the plea forms with the Petitioner and believed that the Petitioner understood the consequences of going to trial versus accepting the settlement offer. Moreover, at the guilty plea hearing, the court thoroughly advised the Petitioner of his rights and the rights he would waive by pleading guilty. The Petitioner maintains that he was scared and did not understand his pleas at the time, but the record indicates otherwise. The Petitioner was very clear about entering a "best interest" plea in the assault case, while entering guilty pleas in the other two cases after confirming that the facts as presented by the State were "most definitely" true. At no point did the Petitioner express hesitation, confusion, or unwillingness to plead guilty. The record supports the post-conviction court's findings that the Petitioner chose to accept the guilty plea to avoid the risk of conviction by a jury. Thus, we conclude that the Petitioner has failed to show that the post-conviction court erred by denying his petition for post-conviction relief, and he is not entitled to relief.

## CONCLUSION

Based on the above authority and analysis, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE